IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF TENNESSEE
WESTERN DIVISION

| | |
|---|---|
| DAVID NAMER, | |
| Petitioner, | |
| vs. | No. 13-2049-STA/cgc |
| WARDEN ANTHONY HAYNES, | |
| Respondent. | |

ORDER DENYING PETITION PURSUANT TO 28 U.S.C. § 2241
ORDER CERTIFYING APPEAL NOT TAKEN IN GOOD FAITH
AND
NOTICE OF APPELLATE FILING FEE

On January 25, 2013, Petitioner David Namer, Bureau of Prisons ("BOP") inmate registration number 15869-034, an inmate at the Federal Correctional Complex ("FCC") in Forrest City, Arkansas, filed a *pro se* petition pursuant to 28 U.S.C. § 2241 and paid the filing fee. (ECF Nos. 1 & 2.) The Clerk is directed to record the respondent as Warden Anthony Haynes.[1]

On September 28, 2000, a federal grand jury returned a ninety-five count indictment, charging Namer with multiple counts of securities fraud, mail fraud, wire fraud, money laundering, and tax evasion, and one count of criminal forfeiture. (United States v. Namer, No. 00-20176, Criminal "Cr." ECF No. 1.) From July 1-

---

[1] Although the petition names the United States as the respondent, the only proper respondent to a habeas petition is the petitioner's custodian. Rumsfeld v. Padilla, 542 U.S. 426, 434-35, 124 S. Ct. 2711, 2717-18, 159 L. Ed. 2d 513 (2004). The Clerk is directed to terminate the United States as a party to this case.

August 20, 2002, then United States District Court Judge Bernice B. Donald[2] presided at a jury trial, at which the jury found Defendant guilty as charged. (Cr. ECF No. 469-508.) On May 6, 2003, Judge Donald held a sentencing hearing and sentenced Namer to three hundred fifty (350) months of imprisonment, to be followed by a five-year period of supervised release. (Cr. ECF No. 559, Cr. ECF No. 562.) He was also ordered to pay restitution of $32.7 million and to forfeit $34.65 million. (Id.) Defendant appealed. (Cr. ECF No. 557.)

The United States Court of Appeals for the Sixth Circuit affirmed Namer's conviction, but remanded the case for resentencing because he had been sentenced under a mandatory-Guidelines scheme, in violation of United States v. Booker, 543 U.S. 200, 122 S. Ct. 738, 160 L. Ed. 2d 621 (2005). (Cr. ECF No. 654; United States v. Namer, 149 Fed. App'x 385 (6th Cir. Aug. 25, 2005).) On remand, the Judge Donald conducted a resentencing hearing on July 6, 2007, and imposed a sentence of imprisonment for two hundred forty (240) months, to be followed by a three-year period of supervised release. (Cr. ECF No. 679.) An amended judgment was entered on July 31, 2007. (Cr. ECF No. 681.) Defendant did not appeal after resentencing.

---

[2] Judge Donald is now an appellate judge on the United States Court of Appeals for the Sixth Circuit.

The facts underlying Defendant's conviction were summarized by the United States Court of Appeals for the Sixth Circuit as follows:

BACKGROUND

A. The Issuance of Private Placement Corporate Notes

After his release from prison following a 1980 conviction for wire fraud, Namer moved to Memphis, Tennessee, where he began a scheme to raise funds for cash-strapped companies with no credit. The scheme involved issuing unregistered corporate notes, known as private placements. These private placements, which would be marketed and sold across the country by licensed security dealers, are not rated by any quality-control organization and are thus high risk.
Namer hired attorney Larry Baresel to prepare the Private Placement Memoranda ("PPM's") and to serve as bond counsel during closings. On most of the note issuances Namer planned he was the primary control person, but since Baresel told him that listing himself as control person would require Namer to disclose his prior fraud conviction, Namer never disclosed himself as primary control person in any of the PPM's.

In 1993, Namer recruited Craig Colwell, a licensed broker at Sutter Securities ("Sutter"), to sell Namer's private placement notes. Colwell informed Namer that no one would purchase his notes without some form of insurance (a "financial guarantee"). This presented a problem for Namer because any potential insurer would want to conduct due diligence, which Namer's corporations would not withstand.

B. Namer's Bribery of Richard Quackenbush

To solve his due diligence problem, Namer entered into a relationship with Richard Quackenbush, a vice-president for Universal Bonding Company ("Universal") in New Jersey. Universal's business was issuing performance bonds, which essentially acted as financial guarantee (insurance) bonds, and Quackenbush was in a position to influence whether such bonds were issued. In January 1994, Quackenbush issued a series of performance bonds for Namer's companies. These guarantees would normally

3

have required collateral equal to the full coverage amount of the bonds, but Namer did not have the collateral, so Universal issued the bonds anyway at a $50,000 premium.

In February 1994, Namer asked Quackenbush for additional bonds without collateral, which Quackenbush approved. Later that month, Quackenbush asked Namer for a $50,000 loan to use in a personal investment. Namer gave him the $50,000 in two checks, making no provision for repayment. A few days later Namer also gave Quackenbush $400 in cash that the latter implied he would accept as a bribe. Quackenbush continued to approve millions of dollars of performance bonds in violation of Universal's underwriting requirements and without requiring any collateral. The bribes continued as well. Namer helped Quackenbush create an offshore company ("RJJJ") to which Namer sent $34,959.46 in checks. In October 1994, Quackenbush sent Namer a fax asking him to pay Quackenbush's home mortgage, and over a two-year period thereafter, Namer funneled $36,154.91 from one of his companies to pay Quackenbush's mortgage.

This scheme resulted in Quackenbush's issuing $17 million in performance bonds for Namer's companies. Namer never pledged any collateral for these bonds, which ultimately cost Universal and its re-insurer $7.75 million. Namer also never informed any of his investors that their notes were backed up by fraudulently obtained bonds.

C. Namer's Bribery of Craig Colwell

Once Namer had obtained the performance bonds, Colwell could market Namer's notes. Over the course of a year and a half, Namer made $90,000 in under-the-table payments to Colwell, who sold over $22 million of Namer's notes to investors. None of the payments to Colwell was ever disclosed to Colwell's employer (Sutter) or its clients, or in the PPM's prepared by Namer and Baresel for prospective investors. The payments to Colwell for selling notes began in January 1994, which coincided with the beginning of Namer's bribery of Quackenbush in return for his issuing bonds as insurance. The whole scheme ended up costing Sutter $1.2 million, because when the notes went into default Universal refused to pay under some of the performance bonds.

D. Namer's Bribery of Bruce Barbers

Namer engaged in a similar bribery arrangement with Bruce Barbers of the New York-based brokerage firm Meyers, Pollock, Robbins ("MPR"). As an MPR broker, Barbers sold over $1.5 million in notes for Namer; in return, Namer made $141,155 in corporate check and wire payments to an account held by Barbers under another name. These payments were never disclosed to any purchasers of the notes.

E. Namer's Falsely Representing That Notes Were Insured

Meanwhile, an audit at Universal revealed problems with performance bonds issued to Namer, causing Quackenbush to resign in March 1995. This development left Namer without a source of performance bonds for his note issues. Namer's Ponzi scheme required issuing additional notes to pay off prior note obligations. Without new note issues, Namer would default on principal and interest payments on old ones, and his scheme would be discovered.

After leaving Universal, Quackenbush joined another firm, National Surety Specialists. In mid 1995, Namer contacted Quackenbush and succeeded in getting National Surety to issue "consents of surety" for some of his companies. "Consents of surety" are not actual performance bonds insuring the notes, but merely commitment letters from insurance companies to issue insurance if they receive the appropriate collateral. No insurance was ever issued, however, because Namer never provided the requisite collateral; his intent all along was to use the consents of surety to trick investors into believing his notes were insured when they were not.

Namer needed more consents of surety than he could get from National Surety, which led Quackenbush to introduce Namer to Fred Smith, who owned Associated Insurance Agency, an insurance brokerage firm in Boston. Smith issued several consents of surety from Ranger Insurance Company, which Ranger never knew of or approved.

Smith gave Namer consents for $18 million in insurance, but both men realized Namer could never provide the $18 million in collateral necessary actually to obtain the insurance and only wanted documents to make it look as if he had failsafe insurance commitments. Therefore, Namer indicated in his PPM's that he had irrevocable and unconditional insurance commitments. When brokers or potential investors asked to see the consents of surety,

Namer simply whited out the collateral condition from the letters, and then faxed the apparently unconditional consents to the relevant inquirers.

Namer sent such forged documents to various brokers trying to verify his insurance, the trust company overseeing the bond offerings, and any investors attempting to verify the insurance. Meanwhile, Smith agreed to vouch for the forged consents of surety when inquiries were made to him, which led brokers and investors to believe mistakenly that Namer's notes were insured. On the occasions when interested parties wanted to see actual copies of the performance bonds, Namer forged them. When they wanted to contact Ranger to verify insurance, Namer told them they were not allowed do so and that he would verify it for them.

F. Namer's $6 Million Sales of Unauthorized Ray and Ross Notes

Namer also sought to generate legitimate revenue by entering into a contingent agreement to purchase Ray and Ross Transport, Inc. ("Ray and Ross"), a Las Vegas bus line, from Sammie Armstrong, who had owned and operated Ray and Ross for over twenty years. Since Namer's operating the bus line required approval of the Nevada Public Service Commission ("PSC") (based on a check of the bus line's finances), the sale was expressly conditioned on his obtaining such approval. Therefore, Ray and Ross's stock was placed in escrow and Armstrong maintained control of the company's Board of Directors pending Namer's obtaining PSC approval. As it turned out, Namer never obtained this approval, and thus never gained legal control of Ray and Ross.

Nonetheless, in February 1996, Namer caused $6 million in notes to issue on behalf of Ray and Ross, without the knowledge of the company's Board, which wrecked the already struggling company's financial reputation and assured that Namer would never get the PSC approval necessary to effectuate the purchase. Namer and Baresel created a bogus PPM to market the Ray and Ross notes. Namer had the necessary documents signed by a Steven Slade, who represented himself as president of Ray and Ross, but who actually held no position at the company. Thus, Namer essentially sold worthless pieces of paper to investors. Moreover, he falsely represented in the PPM that these non-existent notes were insured, and when

investors and brokers requested copies of performance bonds, Namer sent them counterfeit bonds. Baresel informed Namer at the time that the Ray and Ross scheme was criminal fraud.

G. Namer's Fraudulent Northstar Notes

Namer also obtained control of a failing Las Vegas commuter airline, Tri-Star Airlines, and sold Tri-Star notes to investors. He engaged in negotiations with Northwest Airlines to make Tri-Star a commuter airline for Northwest, and eventually changed Tri-Star's name to Northstar Airlines in hopes of reaching such a deal. In May 1996, Namer caused Northstar to issue $6.2 million in notes, ostensibly for Northstar's startup costs. Namer falsely represented in the PPM's and other communications that the Northstar notes were fully insured and that Northstar had a tentative contract with Northwest. No such contract ever existed with Northwest, which broke off negotiations with Namer by sending him a "drop dead" letter upon learning of his 1980 federal felony conviction.

Although Namer had sold millions of dollars worth of Northstar notes prior to receiving this letter, he never informed purchasers that there would be no revenue from which to make interest and principal payments on the notes. Even worse, weeks after receiving the "drop dead" letter, Namer sold $1.5 million in notes to the Seventh Day Adventist Church. He falsely represented that the deal with Northstar was still alive, and the church lost its entire investment.

H. Namer's Fleecing of Gabriel Elias

In late 1995, Namer solicited an investment in Tri-Star notes from Gabriel Elias, an elderly investor in Pennsylvania who was attracted to the investment because of its high rate of return and insured notes. Namer gave Elias a PPM and fake performance bonds that convinced him the notes were insured. Namer also had Fred Smith (or his son, Tim) falsely verify to Elias that the Gulf Insurance Company was prepared to issue performance bonds on order. Later, after the notes were defaulted, Elias contacted Smith again and the latter admitted he was not affiliated with Gulf Insurance. Elias lost just under $2 million of his $2,150,000 investment in Tri-Star.

I. Namer's Diverting Ray and Ross and Northstar Note Proceeds to Buy MPR

Since Namer constantly needed brokers to market his notes, he purchased an interest in the brokerage firm Meyers, Pollack, Robbins. Namer purchased a fifty percent interest in the firm for $2 million, which required him to divert revenue from the sale of Ray and Ross and Northstar notes to buy MPR. This diversion was not disclosed to Ray and Ross and Northstar noteholders, who had been led to believe their investment would be used to benefit those companies, not for one of Namer's personal investments.

J. Namer's Tax Evasion

Namer evaded approximately $209,568.50 in federal income taxes from 1994 through 1996. He did this in part through corporate diversion-paying personal expenses from the accounts of his companies. Namer also concocted an elaborate scheme to make his home mortgage payments with unreported income, which involved representing his mother in Panama as the home's owner, issuing corporate checks to his step-father Nissim Russo, forging Russo's signature, and depositing the forged checks in the account of the mortgage holder (one deposit even occurred after Russo's death).

K. Proceedings Below

On September 28, 2000, Namer was indicted for ninety-four counts of securities fraud, mail fraud, wire fraud, money laundering, and tax evasion, and a separate count for criminal forfeiture. Because of the complexity of the case and the large volume of documents involved, Namer and his defense team were provided the use of a suite of offices in the courthouse for preparation, electronic copies of all of the government's documents and exhibits, access to make paper copies of these documents, two court-appointed attorneys at trial, two experts, a paralegal, six document examiners, and private investigators. Namer was detained during the twenty-one-month period prior to his trial because the district court found that he posed a flight risk; nonetheless, he was transported three times a week by federal marshals to his defense team's offices in the courthouse to allow him to work with his counsel to prepare his defense.

> During a seven-week trial, the government presented sixty-six witnesses and introduced over 1400 exhibits. On August 20, 2002, the jury returned guilty verdicts on all ninety-four counts, and found for the government on the criminal forfeiture count.

United States v. Namer, 149 Fed. App'x at 388-93.

On June 30, 2008, Namer filed a motion to vacate his conviction pursuant to 28 U.S.C. § 2255. United States v. Namer, No. 08-2437-BBD-cgc (W.D. Tenn. Aug. 26, 2011). Namer alleged that counsel provided ineffective assistance:

(1) because of Defendant Namer's irreconcilable conflict with Attorney Harviel;

(2) by failing to call a Fed. R. Evid. 615 securities expert at trial;

(3) by failing to prepare for trial;

(4) by failing to provide reliable advice;

(5) by failing to obtain and use essential documents;

(6) by failing to obtain documents for cross examination and failing to object to the improper use of documents by the government;

(7) by failing to prepare witnesses for trial;

(8) by failing to call the Court's attention to an extra-marital affair between Assistant United States Attorney Parker and Internal Revenue Service Special Agent Rankin;

(9) by failing to anticipate the United States Supreme Court's holding in United States v. Santos, 553 U.S. 507, 128 S. Ct. 2020, 170 L. Ed.2d 912 (2008); and

(10) by failing to anticipate the Supreme Court's holding in United States v. Cuellar, U.S. ,128 S. Ct. 1994, 170 L. Ed.2d 942 (2008).

9

(Id. at ECF No. 1.) On August 23, 2011, Judge Donald entered an order denying and dismissing the motion to vacate. (Id. at ECF No. 39.) Namer appealed. (Id. at ECF No. 41.) On July 20, 2012, the United States Court of Appeals for the Sixth Circuit denied Namer's application for a certificate of appealability. (Id. at ECF No. 43.)

Namer alleges in this petition that he is actually innocent of all money laundering charges under the holding of United States v. Santos, 553 U.S. 507, 128 S. Ct. 2020, 170 L. Ed. 2d 912 (2008).

Federal prisoners may obtain habeas corpus relief pursuant to 28 U.S.C. § 2241 only under limited circumstances. The "savings clause" in § 2255 provides as follows:

> An application for a writ of habeas corpus in behalf of a prisoner who is authorized to apply for relief by motion pursuant to this section, shall not be entertained if it appears that the applicant has failed to apply for relief, by motion, to the court which sentenced him, or that such court has denied him relief, unless it also appears that the remedy by motion is inadequate or ineffective to test the legality of his detention.

28 U.S.C. § 2255(e).

"Construing this language, courts have uniformly held that claims asserted by federal prisoners that seek to challenge their convictions or imposition of their sentences shall be filed in the sentencing court under 28 U.S.C. § 2255, and that claims seeking to challenge the execution or manner in which the sentence is served shall be filed in the court having jurisdiction over the

10

prisoner's custodian under 28 U.S.C. § 2241." Charles v. Chandler, 180 F.3d 753, 755-56 (6th Cir. 1999) (per curiam) (citations omitted). In this case, Petitioner is attacking the imposition of his sentence and, therefore, habeas relief is not available to him unless relief under § 2255 is inadequate or ineffective. Petitioner carries the burden of demonstrating that the savings clause applies. Id. at 756.

The Sixth Circuit has construed the savings clause narrowly: "Significantly, the § 2255 remedy is not considered inadequate or ineffective simply because § 2255 relief has already been denied, or because the petitioner is procedurally barred from pursuing relief under § 2255, or because the petitioner has been denied permission to file a second or successive motion to vacate." Id. (citations omitted). After its decision in Charles, the Sixth Circuit reemphasized the narrow scope of the savings clause:

> The circumstances in which § 2255 is inadequate and ineffective are narrow, for to construe § 2241 relief much more liberally than § 2255 relief would defeat the purpose of the restrictions Congress placed on the filing of successive petitions for collateral relief. As we explained in Charles, "[t]he remedy afforded under § 2241 is not an additional, alternative or supplemental remedy to that prescribed under § 2255."

United States v. Peterman, 249 F.3d 458, 461 (6th Cir. 2001) (quoting Charles, 180 F.3d at 758) (additional citation omitted).

The § 2255 remedy might be inadequate or ineffective when the Supreme Court announces a new statutory interpretation. Even in that circumstance, a prisoner can obtain relief under § 2241

11

only if he is "actually innocent" of the crime of which he has been convicted. Martin v. Perez, 319 F.3d 799, 804-05 (6th Cir. 2003); Charles, 180 F.3d at 757 ("No circuit court has to date permitted a post-AEDPA petitioner who was not effectively making a claim of 'actual innocence' to utilize § 2241 (via § 2255's 'savings clause') as a way of circumventing § 2255's restrictions on the filing of second or successive habeas petitions."); *see also* Peterman, 249 F.3d at 462 ("Without determining the exact scope of the savings clause, we conclude that defendants' claims do not fall within any arguable construction of it because defendants have not shown an intervening change in the law that establishes their actual innocence.").

The Sixth Circuit has derived its understanding of the definition of "actual innocence" from Bousley v. United States, 523 U.S. 614, 118 S. Ct. 1604, 140 L. Ed. 2d 828 (1998). Martin, 319 F.3d at 804. Bousley held that "[t]o establish actual innocence, petitioner must demonstrate that, in light of all the evidence, it is more likely than not that no reasonable juror would have convicted him ... [and] that 'actual innocence' means factual innocence, not mere legal insufficiency." 523 U.S. at 623–24, 118 S. Ct. 1604 (internal quotation marks and citations omitted). One way to establish factual innocence is to show an "intervening change in the law that establishes [the petitioner's] actual innocence." Peterman, 249 F.3d at 462. This may be achieved by

12

demonstrating (1) the existence of a new interpretation of statutory law, (2) which was issued after the petitioner had a meaningful time to incorporate the new interpretation into his direct appeals or subsequent motions, (3) is retroactive, and (4) applies to the merits of the petition to make it more likely than not that no reasonable juror would have convicted him.

The Supreme Court issued the decision in <u>Santos</u> on June 2, 2008, after Namer was resentenced. <u>Santos</u> changed the definition of the term "proceeds" in 18 U.S.C. § 1956 and overruled Sixth Circuit precedent defining "proceeds" as "gross receipts." *See* <u>United States v. Kratt</u>, 579 F.3d 558, 560 (6th Cir. 2009). The United States Court of Appeals for the Sixth Circuit did not address the retroactivity of <u>Santos</u> until April 12, 2012. *See* <u>Wooten v. Cauley</u>, 677 F.3d 303 (6th Cir. 2012)(holding the new definition of a key phrase in the money laundering statute is a substantive change of law increasing the United States' burden of proof and is retroactive).

Petitioner contends that his money laundering convictions were based on paying the essential expenses of the charged underlying acts creating a merger problem. Unfortunately for Petitioner Namer, <u>Santos</u> applies only when the underlying predicate offense for the money laundering conviction has a statutory maximum that is less than the twenty (20) year maximum of § 1956. Namer was convicted of the predicate offenses that carried a higher statutory

13

maximum of thirty (30) years, instead of the twenty (20) year maximum of § 1956. Thus, there is no merger problem under Santos. *See* Kratt, 579 F.3d at 562 ("'[P]roceeds'" does not always mean profits, as Justice Scalia concluded; it means profits only when the § 1956 predicate offense creates a merger problem that leads to a radical increase in the statutory maximum sentence and only when nothing in the legislative history suggests that Congress intended such an increase. Whenever a predicate offense satisfies this narrow rule, the Justices in the plurality would hold 'proceeds' means profits as well, because they would define 'proceeds' as profits for every predicate offense."). Petitioner is unable to demonstrate his actual innocence through Santos and does not fall within the savings clause of § 2255. The Court does not have jurisdiction to grant him relief under § 2241.

Because Namer is not entitled to invoke § 2241, "it appears from the application that the applicant or person detained is not entitled" to any relief. 28 U.S.C. § 2243. The petition is DENIED and DISMISSED. The Clerk is directed to enter judgment for Defendant.

Federal prisoners who file petitions pursuant to 28 U.S.C. § 2241 challenging their federal custody need not obtain certificates of appealability under 28 U.S.C. § 2253(c)(1). Durham v. United States Parole Comm'n, 306 F.3d 225, 229 (6th Cir. 2009); Melton v. Hemingway, 40 F. App'x 44, 45 (6th Cir. 2002) ("a federal

14

prisoner seeking relief under § 2241 is not required to get a certificate of appealability as a condition to obtaining review of the denial of his petition"); *see also* Witham v. United States, 355 F.3d 501, 504 (6th Cir. 2004) (28 U.S.C. § 2253 "does not require a certificate of appealability for appeals from denials of relief in cases properly brought under § 2241, where detention is pursuant to federal process").

A habeas petitioner seeking to appeal must pay the $455 filing fee required by 28 U.S.C. §§ 1913 and 1917. To appeal *in forma pauperis* in a habeas case under 28 U.S.C. § 2241, the petitioner must obtain pauper status pursuant to Federal Rule of Appellate Procedure 24(a). Kincade v. Sparkman, 117 F.3d 949, 952 (6th Cir. 1997). Rule 24(a) provides that a party seeking pauper status on appeal must first file a motion in the district court, along with a supporting affidavit. Fed. R. App. P. 24(a)(1). However, Rule 24(a) also provides that if the district court certifies that an appeal would not be taken in good faith, or otherwise denies leave to appeal *in forma pauperis*, the petitioner must file his motion to proceed *in forma pauperis* in the appellate court. *See* Fed. R. App. P. 24(a)(4)-(5).

In this case, because Petitioner is clearly not entitled to relief, the Court determines that any appeal would not be taken in good faith. It is therefore CERTIFIED, pursuant to Fed. R. App. P. 24(a), that any appeal in this matter would not be taken in good

faith. Leave to appeal *in forma pauperis* is DENIED. If Petitioner files a notice of appeal, he must also pay the full $455 appellate filing fee or file a motion to proceed *in forma pauperis* and supporting affidavit in the United States Court of Appeals for the Sixth Circuit within thirty (30) days.

IT IS SO ORDERED this 18th day of November, 2013.

**s/ S. Thomas Anderson**
S. THOMAS ANDERSON
UNITED STATES DISTRICT JUDGE